## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> HOWARD MUSIN, JILL SCHWARTZ-MUSIN, SSC SERVICES, INC., M-S SERVICES, INC., SCHWARTZ'S SYSTEMS CORPORATION, <br><br> Defendants. | No. 4:09-cv-00062-JAJ-CFB <br><br> **ORDER** |

This matter comes before the court pursuant to trial on the merits of this case in which the government seeks to enjoin the defendants from engaging in income tax preparation services. The court held an eight-day trial between January 10 and January 20, 2011. The court grants the government's requested injunction.

This case is primarily about the defendants' preparation of tax returns for small, home based businesses. The evidence showed a consistent pattern of abuse by the defendants on these returns. To the Musins, the ownership of a small business has been treated as a license to convert almost any of one's personal expenses into business deductions. According to them, if you believe that looking successful helps make you successful, your clothes, hair care, and manicures are deductible. If your dog barks while you are away from your home based business, it's deductible. If your child's nanny ever answered the business phone, the nanny is deductible. If you visit a business associate while on vacation, it is deductible. If you pay rent to yourself, or even if you don't, it's deductible. If you have a six year old child, payments to the child are deductible employee expenses. If you have used your living room television in a business meeting, it's deductible. And your hobbies, like scuba diving, pet cats and flying, easily deductible. It is not any one client or any particular deduction that is at issue here. It is a

1

wholesale pattern of taking deductions without justification that entitles the government to injunctive relief.

The Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Background

Defendants Jill Schwartz-Musin and Howard Musin are income tax preparers who specialize in preparing returns for home-based business.  Musin and Schwartz-Musin primarily conduct business through Corporate Defendant SSC Services, Inc., but Schwartz-Musin also operates Corporate Defendants M-S Services, Inc. and Schwartz's Systems Corporation.

Schwartz-Musin worked for the IRS between 1972 and 1978, for part of that time as a Special Agent in the Criminal Investigation Division.  (Tr. 25:2-8). Schwartz-Musin began preparing federal tax returns for clients in 1982. (Tr. 26:5-9).  In 1987, she was barred from representing taxpayers in disputes with the IRS for falsely holding herself out to customers as a CPA.  (Ex. 1027, Tr. 44:17-18).  In particular, the IRS found:

> Ms. Schwartz executed powers of attorney, Form 2848, indicating that she was a CPA licensed to practice in the state of Iowa.  A check with the Iowa Society of Certified Public Accountants determined that this was not true.
> . . .
> The District Director's position is that by using the designation CPA in her dealings with the Internal Revenue Service when she was not a CPA, Ms. Schwartz gave false or misleading information to the Department of the Treasury and its employees [violating Section 10.51(b) of Circular 230].

(Ex. 1027).  Schwartz-Musin appealed the District Director's decision, stating "I used CPA to mean current power of attorney."  (Ex 1026, Tr. 41:24-42:10).  The IRS Director of Practice affirmed the District Director's decision, stating that "[Schwartz-Musin] is familiar with tax and accounting matters and as such should have reasonably known that by using the initials CPA on official forms these initials would be construed to mean

Certified Public Accountant."  (Ex. 1027).

Despite the IRS bar, Schwartz-Musin continued to represent clients before the IRS, submitting documents to the IRS during client audits, (Tr. 54:13-23), and once accompanying a client to an audit and answering questions posed by the examiner.  (Tr. 61:8-62:1).

During audits in 1996 and 1997, Schwartz-Musin submitted back-dated leases to the IRS in an attempt to substantiate deductions she took for clients' rent expenses.  In 2000, a grand jury in the Southern District of Iowa indicted Schwartz-Musin on eleven counts of obstructing the administration of the internal revenue laws and four counts of willfully failing to file federal income tax returns for her corporation.  *United States v. Musin*, No. 4:00-CR-66 (S.D. Iowa July 28, 2000).  Schwartz-Musin pled guilty in this Court to one count of obstructing the administration of internal revenue laws in violation of 26 U.S.C. 7212(a).  *Id*.  She received a sentence of ninety days in a community corrections facility, five months of home confinement, one year of probation, and a $15,000 fine.  *Id.*

Howard Musin has been working with Schwartz-Musin since approximately 1991, and they prepare returns through SSC Services, Inc. (Tr. 33:12-13).  Schwartz-Musin stopped signing returns in 2002 or 2003, and Howard Musin now reviews and signs all returns prepared by SSC Services, including those prepared by Schwartz-Musin.  (Tr. 36:18-19).   Musin is an enrolled agent and is qualified to represent clients before the IRS.  (Tr. 957:11-23). Schwartz-Musin works for SSC Services as an independent contractor through her corporation M_S Services, Inc.[1]  (Tr. 30:5-9)  Currently, Musin and Schwartz-Musin both perform preliminary work on returns, which involves examining a client's income and expense information, sometimes during an interview,

---

[1] She was also formerly an officer and employee os Schwartz's System Corporation, but that corporation no longer has employees and is not currently receiving income.

and then entering the information into a computer program that generates federal returns.[2]

As part of its investigation of Defendants, the IRS audited 168 of Defendants' clients' tax returns from tax years 2003 to 2006. (Tr. 66:25-67:1). The IRS found almost all of those audits to contain inaccuracies – predominantly improper deductions – which have resulted in this litigation.

### B. Schwartz-Musin's Tax Philosophy

Schwartz-Musin's remark during a March 12, 2005 speech aptly summarizes her tax preparation philosophy[3]: "I think that you can write off just about everything that you do in your personal life through your business. " (Ex. 1537). And when asked at trial whether she can "call just about anything anything" on a return, Schwartz-Musin answered "I suppose given the right set of circumstances that would be true." (Tr. 196:22-25).

Schwartz-Musin has given presentations to clients and potential clients, encouraging them to "write off their lifestyle." To that end, she urges people to "be creative . . . and look at the kind of lifestyle that you have . . . and if you can find a way to write that off because you're now self-employed." (Ex. 1534). In a March 25, 2002 presentation, Schwartz-Musin advised clients on how to write off personal vacations:

> And if you want to take a trip – let's say you live in Iowa . . . .
> And so we have a lot of snow birds, and people go down to
> Texas or they go out to Arizona or they go over to California,

---

[2] Prior to 2009, the preliminary work was recorded on an "input sheet," the data from which would later be entered into a computer program that generated returns.

[3] The Court finds that Schwartz-Musin's presentations and tax philosophy are relevant here because they are probative of Defendants' intent to understate their clients' tax liability. In particular, the Court finds Defendants' claim that they trustingly rely upon information provided by their clients to be undermined by Schwartz-Musin's promotion of a "write-off-your-lifestyle" approach to tax preparation. After telling clients to write off their lifestyle, Defendants cannot hide behind inaccurate expense reports and recite the defense that they trust and do not audit their clients.

> and they enjoy the winter.  And let's say you're in a position
> where you'd like to do that.  Well, what you need to do is find
> a way of writing off that two-week trip or two-month trip,
> however long you're going to be gone.

(Ex. 1534).

Schwartz-Musin also advises clients to pay their children – some younger than six years old – to do chores for the business and to deduct salaries paid to the children as business expenses.  (Ex. 1534, 1537).  Similarly, she advises potential clients to employ their relatives in their business in order to make family-related travel a business deduction:

> You want to go visit your mother for Thanksgiving . . . . If
> you're self-employed and you sponsor your mom into your
> business, now you're going to meet with your distributor.  All
> of a sudden, that trip for Thanksgiving is a deductible
> business trip.

(Ex. 1534).  Schwartz-Musin even advised clients that they could deduct ordinary books purchased at airports during travel as an "ordinary and necessary" business expense.  (Ex. 1536).

A common example of Schwartz-Musin's "write-off-your-lifestyle" philosophy is the deduction of "image" expenses.  In the same 2005 teleconference, she explains:

> If you buy things that are either mandated by your company or
> that have a logo, a company logo on them, or they're ordinary
> and necessary for what you're doing, they are deductible
> business expenses.  Now obviously for Mary Kay, Mary Kay
> has a director suit every year, so the director suit is deductible.
> But then you have to have shoes and a purse and a blouse and
> maybe a scarf to wear with that suit, that all becomes a
> deductible business expense, as well as the cost of having the
> suit cleaned or washing the blouses.  If you have to buy
> formal clothes for a presentation or a suit for a presentation,
> that also is a deductible business expense. . . . Because again,
> it's your entire image, and that is the image that's listed on
> our sheet.

(Ex. 1536).  She believes this applies equally to expenses for hair care, nail care, and makeup and has taken numerous deductions on behalf of clients for these kinds of expenses since approximately 1996 or 1997.  (Tr. 182:5-8).

### C. Misrepresentations of Qualifications

SSC Services has never employed a CPA, but Musin and Schwartz-Musin have represented otherwise on multiple occasions.   From 2004 through 2008, SSC Services sent each of its clients a privacy policy, which began as follows:

> CPAS, LIKE ALL PROVIDERS OF PERSONAL
> FINANCIAL SERVICES, ARE NOW REQUIRED BY LAW
> TO INFORM THEIR CLIENTS OF THEIR POLICIES
> REGARDING PRIVACY OF CLIENT INFORMATION.
> CPAS HAVE BEEN AND CONTINUE TO BE BOUND BY
> PROFESSIONAL STANDARDS OF CONFIDENTIALITY
> THAT ARE EVEN MORE STRINGENT THAN THOSE
> REQUIRED BY LAW.  THEREFORE, WE HAVE
> ALWAYS PROTECTED YOUR RIGHT TO PRIVACY.

(Ex. 1470).  Any client reading this policy would be mislead to think that someone at SSC Services was, in fact, a CPA.

Schwartz-Musin also misrepresented her qualifications in emails with clients.  In a January 09, 2007 email, Schwartz-Musin explicitly told a client that she was a CPA but that she did not advertise her qualifications publicly to avoid potential liability.  (Ex. 1110).  Similarly, in response to another client's email seeking a CPA to join the Direct Sellers Women's Association, Schwartz-Musin failed to clarify in her reply that she was not, in fact, a CPA.  (Ex. 1519).

Schwartz-Musin has also misrepresented her qualifications to the IRS.  On eight separate occasions from April 30, 2001 to September 23, 2003, Schwartz-Musin submitted false information on a Power of Attorney and Declaration of Representative Form 2848 to the IRS. (Exs. 1011-1018). On each Form 2848, Schwartz-Musin signed her name under penalty of perjury stating, "I am not currently under suspension or

6

disbarment from practice before the Internal Revenue Service." (Exs. 1011-1018). As discussed earlier, however, Schwartz-Musin was under disbarment when she submitted the forms.   Additionally, Schwartz-Musin made what the Court finds to be a intentionally misleading mark on each 2848, which had the effect of misrepresenting her qualifications.  The relevant portion of a form was completed by entering a handwritten letter on a blank line: a "b" signified the filer was a CPA and an "h" signified the filer was an unenrolled preparer.  Schwartz-Musin's entry on each form was equivocal but looked more like a "b" than an "h," falsely indicating she was a CPA.   (Exs. 1011-1018).

As with so many issues in this case, it is the pattern of misconduct here that is telling.  Defendants attempted to explain away each of these misrepresentations as the result of oversights or miscommunications, but the undeniable pattern of misrepresentation belies such innocent explanations.  The Court notes further that Schwartz-Musin was barred from representing clients before the IRS for conduct of exactly this sort in 1987.

### D. Image Expense Deductions

Defendants have deducted so-called image expenses on behalf of clients since 1996 or 1997.  Defendants have admitted to taking the following image expense deductions:

| Client | Year | Amount |
|--------|------|--------|
| George and Barbara Hasselmann | 2003 | $1,566.00 |
| Hasselmann, Inc. | 2004 | $1,999.00 |
| Hasselmann, Inc. | 2005 | $1,945.00 |
| Ulrich Associates, Ltd. | 2003 | $5,928.00 |
| Ulrich Associates, Ltd. | 2004 | $2,629.00 |
| Ulrich Associates, Ltd. | 2005 | $1,407.00 |
| Doris Johnson | 2003 | $2,541.00 |

| | | |
|---|---|---|
| Doris Falk Johnson, Inc | 2004 | $4,086.00 |
| Doris Falk Johnson, Inc | 2005 | $5,553.00 |
| Midwest Distribution, Inc. | 2003 | $10,966.42 |
| Midwest Distribution, Inc. | 2004 | $4,992.00 |
| Gottlieb Associates | 2003 | $2,162.00 |
| Gottlieb Associates | 2004 | $2,125.00 |
| Gottlieb Associates | 2005 | $2,068.00 |
| Toovell Associates | 2003 | $2,077.00 |
| Toovell Associates | 2005 | $3,135.00 |
| Becker Chaney & Associates | 2003-2005 | Unspecified Amounts |
| Nolan Enterprises | 2004 | $6,257.00 |
| Nolan Enterprises | 2005 | $1,158.00 |
| RA Pryor Enterprises, Inc. | 2005 | $1,857.00 |
| Robert and Jenny Williams | 2003 | $1,622.00 |
| Robert and Jenny Williams | 2004 | $3,999.00 |
| Robert and Jenny Williams | 2005 | $4,402.00 |
| Leland and Brenda Burns | 2003 | $2,000.00 |
| Leland and Brenda Burns | 2004 | $900.00 |
| Leland and Brenda Burns | 2005 | $1,250.00 |
| Better Life Enterprises | 2003 | $1,333.00 |
| Better Life Enterprises | 2004 | $901.00 |
| Better Life Enterprises | 2005 | $632.00 |
| Howard Clark and Christine Dupond Clark | 1998 | $939.00 |
| Howard Clark and Christine Dupond Clark | 1999 | $1,190.00 |
| Howard Clark and Christine Dupond Clark | 2000 | $426.00 |

8

| Howard Clark and Christine Dupond Clark | 2001 | $408.00 |
|---|---|---|
| Stephen & Lyndell Sheets | 2003 | $1,031.00 |
| Stephen & Lyndell Sheets | 2004 | $1,511.00 |
| Stephen & Lyndell Sheets | 2005 | $1,826.00 |

(Ex. 1241). Most of these deductions were for hair and nail care, makeup, or clothing. The deductions were not limited to expenses for products sold by the companies themselves. (Tr. 189:25-190:2). Instead, many relate to third-party products and services. For instance, Defendants deducted $992.79 in purchases at Neiman Marcus for Ulrich Associates, Ltd. in 2004. (Exs. 1035, 1036). On Toovell and Associates' 2005 return, Defendants deducted $3,167.28 in image expenses for purchases at clothing stores such as J.Crew, Victoria's Secret, and Bloomingdales, as well as various salons. (Ex. 1089, Tr. 212:1-213:7). Rather than consider the appropriateness of the expenses, Schwartz-Musin explained to Brenda Bruns of ABS Associates that she measures the appropriateness of image expenses "more in relationship to what your income is [than] what is allowed."[4]  (Ex. 1109, 1519).

Defendants claim to no longer take image deductions because "it is not worth the fight" with the IRS. (Tr. 988: 18-24). However, Defendants did not stop taking the deductions upon learning the IRS considered them improper. Instead, Defendants deducted the same expenses under different names. For instance, Defendants listed $1,566 in image expenses as "Supplies" on the 2003 federal return for Hasselmann, Inc.

---

[4] In fact, Defendants applied this philosophy to more than just image expenses when they prepared returns for R.S. Tyson, Inc. in 2006, when both its total income and total deductions equaled $163,989. (Ex. 1191). In that year, Defendants claimed a $47,000 deduction for "contract labor" on behalf of the company. (Ex. 1191). That $47,000 was not actually paid to contract laborers, however, but was money that the Tysons claim to have taken out of the business. (Tr. 366:19-21). Defendants claim that it was merely coincidence that the $47,000 in contract-labor deduction happened to zero-out the company's annual income in 2006. (Tr. 368:18-20). The Court finds differently.

(Ex. 2453, Tr. 192:23-193:4). They did the same thing for Hasselmann, Inc. in 2004, deducting $1,999 in image expenses as "Supplies." (Exs. 2455, 2456, 1621). For Gottlieb and Associates, Defendants relabeled a $2,125 image expense deduction as "Advertising and Promotion" on the company's 2004 tax return. (Exs. 1646, 1649). The Court finds that Defendants renamed these deductions to conceal their continued deduction of image expenses.

### E. Rent Deductions

Some of Defendants' largest deductions were for rent of home office space. Often, Defendants took such deductions knowing their clients made no actual rent payments and had no lease. Defendants also deducted numerous expenses for maintenance of and improvements to clients' personal residences.

In one instance, Defendants shifted rental income from one of their client's rental properties to his personal residence, which received no actual rental income. (Exs. 1529, 1354). Defendants did this seemingly to legitimize deductions for expenses incurred for repairs and maintenance to the client's personal residence, and they did it despite the client reporting no rental income to his personal residence and never asking Defendants to do so. (Ex. 1293). Although the client, Thomas Tillberg of Ronomas, LLC, did use approximately one-eighth of his residence for a home office, this could not justify the deductions taken in relation to that residence. In 2007, Defendants deducted $3,170 in utilities, $2,979 in phone expenses, and $2,573 in taxes – all related to Tillberg's residence. (Ex. 1294). By shifting rental income from another property to Tillberg's residence, Defendants made it look like a rental properly, for which the deductions would appear ordinary. Defendants did not question or apportion utilities expenses when a small portion of the home was used for business. They were content to assume that the client had already done so.

For another client, Shrishti, Inc., Defendant's took a $12,000 deduction for rent paid to the business's owners, Arindam Chatterjee and Devlina Lahiri, for use of a 144

10

square-foot portion – four percent – of their 3,500 square-foot home.  (Ex. H18). Dividing the rent paid per square foot yields an annual rent of approximately $83 per square foot.  At that rate, the annual rent for the entire home would be $300,000.  Yet, Chatterjee testified that his mortgage for the home was only $21,600 annually and that he purchased the home in 2003 or 2004 for only $360,000.  (Tr. 822:2-9).

Defendants advised Chatterjee that he could take this deduction, knowing that Shrishti paid no actual rent and had no lease agreement.  (Tr. 823:2-6, Ex. 1204).  In fact, Defendants assisted Chatterjee is preparing backdated leases to justify Shrishti's rent deductions during their 2006 audit.  (Exs. 1196, 1195, 1199, Tr. 826:12-18).  The leases – which were submitted to the IRS – were dated April 1, 2004 and January 1, 2005, respectively, but were created in 2006.  (Tr. 826:12-830:11).  During the 2006 audit, Schwartz-Musin also sent an email to Arindam Chatterjee, saying "If we could provide a larger office space, that would be wonderful." (Ex. 1196).  Defendants considered a $12,000 rent deduction for 144 square feet of residential property to be unreasonable.

In 2003, Defendants took a $24,000 rent deduction for their client, RS Tyson.  (Ex. 1176).  However, RS Tyson paid only $9,300 in rent that year.  (Ex. 1178).  Defendants claim the additional $14,700 was money RS Tyson used to pay off Shirley Tyson's personal credit cards and that they "reclassified" this amount as rent paid to Shirley Tyson.  (Tr. 355:20-23).  Defendants made the same "reclassification" in 2004, when RS Tyson reported paying $5,200 in rent for office space, (Ex. 1182), and Defendants deducted $36,000 in rent on its return. (Ex. 1184).

Similarly, Defendants claimed an $18,000 rent deduction on DFJ, Inc.'s 2004 federal income tax return, knowing that the corporation never paid rent to its owner, Doris Johnson, and had no lease.  (Ex. 2022, 1519, Tr. 992:2-994:19).  Further, Musin determined the amount of the rent deduction not based upon the space rented or market value but upon the amount of money Doris Johnson removed from the corporation for personal expenses, such as groceries.  (Tr. 995:12-25).  In fact, Defendants reduced the

11

rent deduction in 2005 without being informed of any change in the rental space or market value.  (Tr. 996: 22-997:2).   Also for DFJ in 2005, Defendant's took a $9,112 deduction for "Office Expenses" when DFJ reported to Defendants only $4,112 in such expenses.  (Exs. 1529, 1472, 1004).  A year later, Defendants deducted $3,159.26 in groceries, home repairs, homeowner's dues, and household expenses a part of DFJ's rent expense deduction.  (Exs. 1242, 1389).

Defendants also took $12,000 rent deductions for Coogan & Associates in years 2004, 2005, and 2006, knowing the company had no lease and paid no actual rent to Joanette Coogan or anyone else.  (Exs. 1359-1361).  Defendants similarly took a $6,384 rent deduction for PDC, LLC in 2005, knowing PDC also paid no rent that year. (Exs. 1325, 1319, 1320, 1321).

Defendants routinely also deducted expenses for repairs and maintenance to clients' homes, regardless of the amount and kinds of expenses.  For instance, on RS Tyson's 2007 federal income tax return, Defendants deducted $7,285 for repairs and maintenance to the Tyson's home, which included the cost of chemicals to treat the their one-acre fish pond, the cost of flower beds, driveway gravel, a lawn mower, weed treatment, a pump for their well, termite control, and tree trimming.  (Ex. 1194).  Similarly, Defendants deducted $1,035 in "repairs" on Coogan & Associates' 2006 return, which included the entire cost reported by the Coogans for home landscaping, deck stain, mulch, and sprinklers.  (Ex. 1364, 1277, 1361).

For Ronomas, Defendants deducted $2,979 in phone expenses as a business expense, despite the client using only one-eighth of its owner's home for office space. (Ex. 1294). For Brian Michael, owner of PDC, Defendants depreciated a "conference table and chairs" with a basis of $2,706 in both 2005 and 2006.  (Ex. 1319, 1320). However, Michael testified that PDC did not own any furniture, that he never reported owning a conference table and chairs to Defendants, and that he was unaware of the depreciation entry until this lawsuit.  (Tr. 738:23-740:13).  Michael actually works at his

12

kitchen table, which was a wedding gift from his in-laws.  (Tr. 740:1-8).

When Brenda Burns replaced the television and furniture in her home recreation room, she emailed Schwartz-Musin to see what portion of the expenses would be deductible because ABS had "occasional meetings using it, but not on a weekly basis." (Ex. 1106). In response, Schwartz-Musin clarified her approach to the deduction of home improvement:

> As to the TV and furniture.  I will let your conscience be your guide.  We can take a portion or all of it.  If you can show you have meetings and show videos, not a problem to take 100%. I certainly don't have a problem with it.

(Ex. 1106).  Finally, Defendants deducted $3,398 as "repairs and maintenance" for Dixie Hunt's business even though Hunt reported those expenses to Defendants as "personal" expenses for home improvement.  (Ex. 1441, Joint Stipulation, ¶ 93).

## F. Travel and Transportation Deductions

Defendants have also deducted personal travel and vacations on behalf of clients. On October 11, 2003, Schwartz-Musin received the following questions by e-mail from her client, Shirley Tyson:

> We are leaving next Wednesday with our whole family . . . to go to California for a[n] 11 day vacation.  We're actually going to my cousin's daughter's wedding, but we're seeing all the sites in Southern Calif. Like Disneyland & The New California Adventure (5 day pass), Sea World, Universal Studios, and we have tickets to the Price Is Right.
> . . .
> Also, [my personal coach] lives 13 miles form where we are flying in at Santa Ana, CA, and we were both wanting to get together in order that we could meet each other.  We were planning on meeting when we first got to Calif, because we can't check in the hotel until later in the day, so I thought that would be a good time.  Could any of the trip be a tax deduction since I'll be meeting with my coach, and then attending a wedding of one of my best customers who

13

purchases $500 every other month?

(Ex. 1123). In her response, Schwartz-Musin advised:

> To answer you[r] questions, yes, you can write off the plane
> tickets and the hotel and food for the days you are gone.
> Since you are taking your distributors, if you are paying, you
> can write off their hotel and food as well.  You cannot take
> off the various tickets you have purchased.

(Ex. 1123).  Defendants took a $4,209 deduction for travel in 2003 for Tyson's company,
RS Tyson, Inc. (Ex. 1176).

Defendants also deducted $14,978 in travel expenses for Coogan & Associates in
2006 for Joanette and Mike Coogan's trip to London and Croatia that year.  (Ex. 1278).
Coogan asked Schwartz-Musin whether the trip was deductible as "lifestyle promotions
for the business." (Ex. 1364).  And rather than respond to Ms. Coogan with advice or
inquiry, Defendants simply took the deduction. (Exs. 1364, 1278).

For their client, Swim with Kim, Inc., Defendants deducted scuba diving vacations
as business expenses.  Through Swim with Kim, Inc., Kim Johnson teaches swimming
lessons to children.  She does not offer scuba certification training but does occasionally
expose her students to the basics of scuba diving in her backyard pool.  In the early 2000s,
Schwartz-Musin advised Johnson that she could deduct the costs of her family's scuba
diving trips as business expenses related to Johnson's continuing education.  (Ex. 1476).
At trial, Schwartz-Musin claimed that Johnson had to log hours spent diving to maintain
her personal certification so she could continue to teach.  (Tr. 180:11-13). However, Kim
Johnson testified at trial that she was certified before 2003 and was not required to log
any diving time to maintain that certification.  (Tr. 865:1-8).  Johnson also testified that
she never told Schwartz-Musin that she was required to log diving time.  (Tr. 869: 22-24).
In 2003, Defendants deducted $500 in "educational" diving expenses during Johnson's
trip to Cozumel, Mexico.  (Ex. 1456, 1312).  Defendants did the same thing in 2004,

taking a $465 deduction, which included the entire cost of scuba diving for Johnson's family of four.  (Ex. 1529, 1314, Tr. 875:24-876:17).  In 2005, Defendants deducted $3,665 as "Travel" expenses for Johnson's trips to Vieques, Puerto Rico and the Turks and Caicos.  (Exs. 1476, 1529, 1316).  Finally in 2007, Defendants deducted $1,060 in "continuing education" expenses and $1,640 in "travel" expenses for Johnson's vacation in the Cayman Islands. (Exs. 1476, 1529, 1318).

Defendants also deducted business-travel expenses never actually incurred by their clients.  When Defendant's Shaklee-distributing clients attended conventions, the Shaklee company often paid part or all of the distributors' costs of attendance.  Defendants then reported those expenses as income because they were paid directly by Shaklee on behalf of the client, but Defendants would also claim business-expense deductions for the exact same costs, thereby offsetting the income on their clients' returns.  (Tr. 432:6-435:2).

For Gottlieb Associates, Defendants deducted the all of costs related to an airplane owned by the Gottliebs.  (Tr. 95:3-21).  Defendants deducted these expenses – $19,005 in 2003, $18,405 in 2004, and $17,369 in 2005 – as an ordinary and necessary business expense because Dr. Gottlieb told Defendants that he met other pilots when flying and encouraged them to join his home-based Shaklee business.  (Tr. 96:11-21, Ex. 1642, 1646, 1650).   Defendants also deducted automobile expenses for Gottlieb and Associates: $23,965 in 2003, $24,000 in 2004, and $8,221 in 2005.  (Exs. 1642, 1646, 1650).  He would also leave business cards on bulletin boards of airports where he stopped.  These acts were purely incidental to hobby flying.  Gottlieb is a dentist.  Thus, in total over the three years, Defendants deducted over $110,000 in transportation expenses alone for the Gottliebs' home-based business.  And Dr. Gottlieb testified at his deposition that he was unaware that Defendants were deducting one-hundred percent of these expenses.  (Tr. 510:1-8).  Rather, he believed that only fifty percent of the plane expenses were deductible and that Defendants were only deducting that amount.  (Tr. 510:1-8).

### G. Child and Pet Care Expenses

Defendants also took business deductions for clients' child and pet-care expenses. In 2004, Defendants deducted over $12,321 in childcare expenses on Shrishti, Inc.'s tax return, labeling the expenses "salaries and wages," which made them look like ordinary business expenses. (Exs. 1204, 1427). Defendants were aware these deductions were for Arindam Chatterjee and Devlina Lahiri's childcare expenses because Chatterjee reported that they paid $10,256 to his mother-in-law for childcare and $2,075 to a nanny – the exact numbers listed under "salaries and wages" on Shrishti's tax return. (Ex. 1204, Tr. 294:4-295:11).

Moreover, when Shrishti was audited in 2006, Arindam Chatterjee emailed Schwartz-Musin, telling her the IRS was looking into Shrishti's nanny expenses and noting that "we might have to gear ourselves up for penalties." (Ex. 1202). Schwartz-Musin responded as follows:

> If asked again, tell her that the Nanny did double duty of
> answering the business phone and keeping the office clean as
> well as watching the children. We will deny any knowledge
> of a nanny, just an office worker.

(Ex. 1202). Thus, not only did Defendants deduct the childcare expenses, but they also coached Chatterjee to lie and offered to lie themselves to the IRS during Shrishti's audit.

Further still, Defendants submitted a backdated, false Form 1099 in an attempt to substantiate Shrishti's "salaries and wages" expense during the 2006 audit. Defendants denied creating or submitting this 1099 at trial. However, Schwartz-Musin offered to prepare the 1099 for Chaterjee's mother-in-law in a September 12, 2006 email, if Chaterjee provided her with the relevant information. (Ex. 1200). That same day, Chaterjee provided the necessary information, and Schwartz-Musin followed up asking for a "a visa [number] or some kind of ID number for your mother-in-law." (Ex. 1200). Chaterjee provided his mother-in-law's passport number on September 14, 2006. (Ex.

1200).  And – with no further email communication between Chatterjee and Defendants – the IRS received a 1099 with exactly that information, including the fraudulent social security number.  The fraudulent 1099 was also printed on the standard form that Defendants exclusively used at the time, and the mother-in-law's name was misspelled on the form, indicating further that the Chatterjees did not prepare it.  The Court finds that Defendants created the false 1099 and submitted it to the IRS.

Similarly, Defendants advised Michael Horowitz that his software company, Applied Video Compression Inc., could classify Horowitz's nanny as a "vendor" and take a deduction for those expenses.  (Ex. 1142, Tr. 325:2-3).  In fact, Defendants deducted Horowitz's nanny expenses as "contract labor" on Applied Video Compression's 2008 return. (Exs. 1834, 1142).  Similarly, Howard Musin advised Dave Weis, owner of Internet Solver, Inc., that his company should hire Weis's nanny for tax purposes.  (Exs. 1407, 1135).  And Tom Koob – an independent contractor for SSC Services – explained to Weis that adding his nanny to the Internet Solver payroll allowed him to "benefit[] from being able to write off 100% of her salary as a business expense."  (Exs. 1407, 1137).   On Internet Solver's tax returns, Defendants deducted $16,687.58 in 2006, and $23,874.96 in 2007, as wages paid to Weis's nanny.  (Exs. 1245, 1408, 1410, 1411, 1412).

Defendants also deducted the costs of dog care for clients.  Steve Chaney asked Schwartz-Musin the following question by email on June 19, 2006:

> I do have one question, however.  An accountant in Suzie's Chamber of Commerce Networking Group told her that we can't deduct dog care while we are away at meetings.  Is that true?

(Ex. 1272).  Schwartz-Musin replied:

> Because you are away on business, anything that you pay to keep your business running is a deductible expense.  That would include the dog if he is the watch dog for your

17

> property.  I assume he is the watch dog since he lives at your
> house and I assume he barks and warns you of people coming
> etc.

(Ex. 1272). Thus – without asking – Schwartz-Musin assumed that Chaney's pet expenses

were deductible.  In effect, as she often did, Schwartz-Musin coached her clients to

misrepresent expenses as ordinary and necessary to their business.  For Becker Chaney &

Associates in 2003, Defendants deducted numerous expenses related to care of the

Chaneys' dog as "conventions and meetings" expense.  (Exs. 1271, 1393, 1241 at 19).

Defendants admitted to taking similar deductions for the Chaneys' dog care in 2004 and

2005. (Exs. 1241 at 19).

### H. Firefighter and Paramedic Meal Expenses

From 2002 or 2003 until 2009, Defendants admitted to taking meal expenses as

unreimbursed business expense deductions for paramedics and firefighters. (Tr. 984:3-4).

Musin claims to have relied upon a one-page flier that Schwartz-Musin brought back

from a tax seminar in the mid-1990s.  (Tr. 981:15-24).  That document states that

firefighter and police workers are entitled to a $7.50 meal expense deduction for each

meal eaten during a shift.  (Ex. 1126).  Before taking these deductions for numerous

firefighter and paramedic clients, Musin admits that he never consulted the Publication

number 553 referenced by the one-page document, nor did he consult any other tax

resource to confirm the allowance of the deduction.  (Tr. 984:11-13, 987:7-8).

Musin also took the deductions despite the fact that his firefighter clients were

never required to contribute to a common-meal fund. (Tr. 912:4-10).  Finally, Musin took

$8.50 deductions for each firefighter or paramedic meal, admitting that "I am not quite

sure where I got $8.50," instead of the $7.50 amount listed on the document.  (Tr. 987:1-

3).  Thus, Musin failed to confirm any of the information contained in the one-page flier

and, at the same time, failed to comply with the terms of that document in taking the

deductions.

### I. Tuition

Defendants also took business deductions for tuition expenses related to clients' family members.  In 2004, Defendants deducted $12,404 in "continuing education expense" for Gerdes Group, a technology consulting company owned by John Gerdes. (Ex. 1223). That expense was actually for Mrs. Gerdes' nursing education.  (Tr. 1195:24-1196:1).   In 2005, Defendants took a "continuing education" deduction of $2,600 for Gerdes Group, which related to payments made to a martial arts academy. (Ex. 1225, 1226).

Similarly, Defendants Deducted $14,975 for Shrishti in 2004, which was for Chatterjee and Lahiri's daughters' school tuition.  Defendants deducted $6,600 for one daughter's tuition at Montessori school as "employee retirement benefits," and $8,375 for another daughter's school tuition as an "employee benefit programs."  (Ex. 1204, 1529, 1627). And for Midwest Distribution, Inc., owned by Debbie Habeck Williams, Defendants deducted a $1,300 contribution to a 529 college savings plan as an "employee benefits" deduction in 2005.  (Exs. 1452, 1453, 1417).

### J. Grocery, Meal, and Entertainment Deductions

 Defendants also deducted one-hundred percent of clients' meals and entertainment expenses.  The 2004 Form 1065 for Nolan Enterprises reflects a $6,069 deduction for "Entertainment" expenses.  That $6,069 actually represents a year of grocery expenses with trips to the store occurring one or two times per week, as reflected in a transaction-by-transaction Category Report appended to the 1065.  (Ex. 2496).  Nothing on the Category Report indicates that the grocery purchases were business related, but Schwartz-Musin testified that Loretta Nolan has weekly business events at her home, where food is served.  (Ex. 2496, Tr. 657:5-12).  For Alagappa International, Defendants deducted $460.29 in meal expenses, which actually represents the cost of ninety-one separate trips to Starbucks.  (Ex. 2586).  Schwartz-Musin also testified that she believes refreshment and meal expenses are fully deductible provided they are not the "primary focus" of the

business event.  (Tr. 658:12-19).

## K. Business Gift Deductions

Defendants also deducted various gift expenses for clients.  Schwartz-Musin testified at trial that she believed the $25.00 business gift limitation does not apply to gifts given with the intention of making future profits or to "promotional awards" given in recognition of achievements.  (Tr. 469:6- 471:19).  Accordingly, Schwartz-Musin advised a client, Brenda Burns, to report birthday, anniversary, and wedding cards, as well as cash given for memorials and weddings, as fully deductible "promotional awards" to avoid the $25.00 limitation on business gifts.

For Becker Chaney & Associates in 2004, Defendants deducted numerous gift expenses – many over $25.00 – as "advertising and promotion" expenses.  (Exs. 1392, 2064, 2430). The total amount deducted under "advertising and promotion" was $23,419. (Ex. 1392).  Of that, $7,029 was for gifts, $6,390 was for actual advertising, and $10,000 was claimed to be a data processing error.[5]  (Exs. 1241, 2430, 1392).

## L. Medical Expenses and Employee Benefits Plans

Defendants' deductions for clients' medical expenses relate mostly to one client, JMJ Therapies, a limited liability company formed by Jim Kippenberger.   Kippenberger's son has autism, and Schwartz-Musin advised him to form a limited liability company so he could deduct the costs of his son's treatment.  (Ex. 1525).  JMJ Therapies' 2004 tax return – prepared by Defendants – claimed $32,476 of expense deductions, including $16,843 allegedly paid as salary and wages, but a mere $300 of income.[6]  (Exs. 1525, 1370).  Defendants took the $16,843 deduction for salary and wages despite the fact that JMJ Therapies reported paying only $974 in wages that year.  The rest of the salary and

---

[5] Defendants claimed to have made a number of data processing errors during trial. Tellingly, none of those errors was ever disadvantageous to a client's tax liability.

[6] They charged another family to use their personal hyperbaric chamber.

wages deducted by Defendants were the medical expenses for Kippenberger's son.  (Exs.
2471, 1371, 1525).  In 2005, Defendants deducted $44,827 in business-expense
deductions for JMJ Therapies, including $39,465 of "Consulting" expenses, and the
company had only $1,050 of income.  (Ex. 1372).  JMJ Therapies' 2005 expense report
listed expenses incurred for the autism treatment of Kippenberger's son, just as in 2004.
(Ex. 1373).  Similarly in 2006, JMJ Therapies claimed $45,387 of expense deductions,
including $41,511 in "Consulting" expenses, and it reported only $220 of income.  (Ex.
1374).  In 2008, JMJ took $32,936 of business expense deductions and had only $950 of
income.  (Ex. 1378).

Defendants also encouraged clients to improperly backdate their employee benefits
reimbursement plans to deduct expenses incurred earlier in the year.  In a December 30,
2004 letter to Arindam Chatterjee, Musin explained:

> Enclosed please find the material you requested for
> establishing a medical reimbursement plan.  If you wish to
> claim this deduction for 2004, they should be dated after the
> adoption date of January 1, 2004.  Please sign and keep both
> copies; I have retained one for our records.

(Ex. 1240).  Defendants gave the same advice to Gottlieb & Associates in a March 26,
2003 letter.  (Ex. 1469).  Similarly, Defendants sent a employee benefits plan to DFJ, Inc.
with an effective date of January 1, 2004, even though DFJ had not incorporated until
September of 2004.  (Ex. 1239).  Defendants did the same thing for Bob and Jenny
Williams.  (Ex. 1129).

## M. Club Dues and Subscription Deductions

Defendants took deductions for expenses related to Wakonda Country Club
membership dues on the return for PDC, LLC.  In 2006, PDC's owner, Bryan Michael
reported the company's expenses to Defendants, including $1,950 in Wakonda dues.  (Ex.
1529).  Schwartz-Musin prepared PDC, LLC's 2006 federal tax return and deducted the
$1,950 as "Dues."  (Ex. 1320).  Michael reported only half of his dues because he felt

unable to justify the entire expense as sufficiently business related, despite Schwartz-Musin simply advising him that the dues were fully deductible if used for his business. At trial, Michael stated that his Wakonda membership was primarily personal but that there was a "culture created" when a client came to see Schwartz-Musin and that her philosophy was to find a reason to make something tax deductible. (Tr. 745:10-13).

Similarly, for Hassellann, Inc. in 2003, Defendants deducted fifty percent of Hasselmann's golf league and other golf expenses – this time, as a "meals and entertainment" business expense. (Ex. 1044, 2453, 1530 at 10). And for Kristalite Imports, owned by Ram Vairavan, Defendants deducted $12,816 in "dues and subscriptions" in 2003. (Ex. 1402). Kristalite Imports' "Expense Detail by Vendor" report shows that the amount reported as "Dues, Fees&Subsc" expenses includes $150 paid to ABC Family Sports & Fitness, $19,719.28 paid to Baylor University, $173.59 paid to Palomar College, $2,680 paid to Queens Gate Homeowners Association, and $52.50 paid to UC Regents. (Ex. 1449). Defendants' input sheet for Kristalite Imports in 2003 shows that Defendants reduced the total of those expenses, which is $26,816, to $16,816 simply by crossing off the initial "2" and replacing it with a "1". (Ex. 1402).

### N. Legal Expenses

Defendants have also taken business deductions for clients' personal legal fees. In 2003, Defendants deducted $3,050 in legal fees paid for the preparation of a will on Becker Chaney & Associates tax return. (Ex. 2059, 1241 at 19). Defendant's claim that the fees were deductible in full because "a substantial portion of the cost dealt with business succession and tax planning issues." (Ex. 1231 at 19). Similarly, Defendants deducted $3,900 in "Legal [and] Professional" fees as a business expense for Bob and Jenny Williams's farm in 2007. (Ex. 1302). Defendants did so after receiving a letter from Jenny Williams, which read in relevant part:

> My son, Jon Ball, was arrested in Key West, Florida, on
> 10/27/2006, at his bachelor's weekend celebration at Fantasy

22

> Fest (three weeks before scheduled wedding)
> . . .
> On 11/27/06, I wrote a check payable to Jon Ball on the
> Marine Bank account in the amount of $3,900 to be paid to
> Hal Schuhmacher, Attorney.

(Ex. 1301).  Thus, Defendants knowingly deducted the cost of criminal legal fees for

Williams' son as a business expense of their farm.

### O. Bad Debt Capital Loss Deductions

Finally, Defendants claimed Schedule D capital losses on Joan and Jeremy Aldrich's

2005 and 2006 personal tax returns in the amounts of $118,927 and $170,061, respectively.

Defendants claimed these losses on the basis of loans totaling $125,000 that the Aldriches made

to Joan's father, James Odum, for the construction of two townhouses.  The biggest of these

loans was a note for approximately $121,000.  (Ex.1515).  Although Defendants claim that the

loan was never repaid, Mr. Aldrich stated in a letter to Defendants that Mr. Odum refinanced the

properties to repay the Aldriches and that all but $9,100 of the loan was repaid in 2001.  (Ex.

1544, Tr. 380:19-25).  Defendants claim that the Aldriches were never actually repaid because

the newly refinanced townhouses were to be Joan's inheritance.   According to the Defendants,

the Aldriches merely inherited their $125,000 loan in the form of mortgaged property.   However,

the Court notes that Defendants have never offered an explanation for why the capital loss was

claimed in both 2005 and 2006.[7]  And even if it had been taken in only one year, the loan was

repaid in 2001.  (Ex. 1544).  A reduction in Joan Aldrich's inheritance resulting from her father's

repayment of the loan is not a capital loss.

### P. Hobby Deductions

For their client Deborah Dursky, Defendants deducted $69,515 in expenses for

breeding cats as an ordinary and necessary business expenses of Dursky's computer

---

[7] In 2005, Defendants claimed a capital loss of $118,927, which is approximately $3,000 less than the note referred to by Mr. Aldrich in his letter to Defendants. (Ex. 1515).  In 2006, Defendants claimed a capital loss of $170,061, and handwritten notes in Defendant's Aldrich customer file indicate the amount was calculated by taking the $125,000 total loan amount and adding an 8% annualized interest amount over the "period" of the loan.  (Ex. 1515, 1516).

consulting business, DKD Enterprises.  This included $19,400 that Dursky paid to herself for renting her own home and her own vehicle for the cattery.  (Tr. 108:1-5).  It also included $7,700 that Dursky paid to her spouse to "manage" the cattery, an arrangement that Schwartz-Musin encouraged Dursky to adopt.  (Tr. 769:24-770:19).   In 2003, DKD had income of $197,000 from computer consulting but took a total of $222,485 in expenses – many from Durksy's cattery activity – for a total loss of $24,228.  (Ex. 1420).  And DKD reported only $250 in cattery-related revenue.  In the face of these enormous cattery-related expenses and only $250 of revenue, the Court finds Dursky's testimony – that she intended to make a profit – to be specious at best.  Dursky's cattery "business" represents yet another example of Defendants' attempts to deduct quintessentially personal expenses – here, for a client's hobby – as ordinary and necessary business expenses.  It also represents another example of Defendants' attempt to disguise improper deductions because Defendants encouraged Dursky to roll the cattery into her legitimate computer consulting business in order to hide the egregiousness of the deductions.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1340 and 1345.  Section 1340 provides district courts with original jurisdiction over civil actions arising under acts of congress providing for internal revenue, and § 1345 provides the same for all civil suits brought by the United States.

### B. Legal Standard for Injunctive Relief

The Government seeks an injunction prohibiting Defendants from acting as tax return preparers under 26 U.S.C. §§ 7407, 7408, and 7402.[8]  Initially, the Court notes that "[w]hen an injunction is explicitly authorized by statute, proper discretion usually

---

[8]  Unless otherwise noted, all statutory references are to the Internal Revenue Code, Title 26 of the United States Code.

24

requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." *United States v. White*, 769 F.2d 511, 515 (8th Cir. 1985) (quoting *United States v. Buttorff*, 761 F.2d 1056, 1059 (5th Cir. 1985)).

### i. Section 7407

To obtain an injunction under § 7407, the Government must prove that (1) the Defendants are tax return preparers; (2) the Defendants engaged in one of the four areas of proscribed conduct set forth in § 7407; and (3) an injunction is appropriate to prevent the recurrence of that conduct. *See* 26 U.S.C. § 7407; *United States v. Ernst & Whitney*, 735 F.2d 1296, 1303 (11th Cir. 1984). Section 7701(a)(36) defines "tax return preparer" as any person who prepares returns for compensation. 26 U.S.C. 7701(a)(36). And § 7407 sets forth the four areas of proscribed conduct as follows:

> (b)(1) that the tax preparer has --
> (A) engaged in any conduct subject to penalty under section 6694 or 6695 or subject to any criminal penalty provided by this title;
> (B) misrepresented his eligibility to practice before the Internal Revenue service, or otherwise misrepresented his experience or education as a tax return preparer;
> (C) guaranteed the payment of any tax refund or the allowance of any tax credit; or
> (D) engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue Laws.

26 U.S.C. § 7407 (1989)[9].

Congress enacted § 6694 to deter abusive practices by preparers. *Brockhouse v. United States*, 749 F.2d 1248, 1251 (7th Cir. 1984). Subsection (a) penalizes a tax preparer who understates a client's tax liability based on a position that the preparer

---

[9]   The conduct penalized by § 6695 is inapplicable to the facts of this case.

knows or reasonably should know has no "realistic possibility of being sustained on its merits." 26 U.S.C. 6694(a) (1989).[10]  Thus, negligent understatements of tax liability are punishable under § 6694(a), and negligence in this context is defined familiarly  as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."  *Brockhouse*, 749 F.2d at 1251-51 (citing *Marcellow v. C.I.R.*, 380 F.2d 499, 506 (5th Cir. 1967), *cert. denied*, 389 U.S. 1044 (1968); *see also Zmuda v. C.I.R.*, 731 F.2d 1417, 1422 (9th Cir. 1984)).

Defendants contend they properly relied upon information furnished to them by clients, in accordance with IRS regulations.  In fact, Circular 230 provides in relevant part:

> (d) Relying on information furnished by clients. A practitioner advising a client to take a position on a tax return, document, affidavit or other paper submitted to the Internal Revenue Service, or preparing or signing a tax return as a preparer, generally may rely in good faith without verification upon information furnished by the client. The practitioner may not, however, ignore the implications of information furnished to, or actually known by, the practitioner, and must make reasonable inquiries if the information as furnished appears to be incorrect, inconsistent with an important fact or another factual assumption, or incomplete.

31 CFR § 10.34(d). Similarly, the standard of care under § 6694(a) requires preparers to exercise due diligence, which sometimes requires them to affirmatively seek additional

---

[10]  Section 6694(a) was amended in both 2007 and 2008.  In 2007, the standard for penalty was changed from an "unrealistic" position to an "unreasonable" one.  Thus, a tax preparer could be penalized for knowingly or negligently understating a client's tax liability if "there was not a reasonable belief that the position would more likely than not be sustained on its merits." 26 U.S.C. 6694(a) (2007).  In 2008, the standard was changed again, such that any position not supported by "substantial authority" was deemed unreasonable. 26 U.S.C. 6694(a) (2008).  However, because the Government's allegations concern returns prepared before enactment of these amendments, the Court applies the "unrealistic position" standard.  In any event, the Court would reach the same conclusion under each of the three standards.

information from clients:

> [I]f the information supplied [by the client] would lead a
> reasonable, prudent preparer to seek additional information, it
> is negligent [under § 6694(a)] not to do so.  A reasonable,
> prudent preparer would inquire as to additional information
> where it is apparent that the information supplied was
> incorrect or incomplete and it is simple to collect the
> necessary additional information.

*Brockhouse*, 749 F.2d at 1252; *see also United States v. Bailey*, 789 F.Supp. 788, 792

(N.D. Texas 1992),  Rev. Rul. 80-265, 1980-2 C.B. 378 (finding liability under 6694(a)

where the preparer "had reason to believe that the information furnished by [the client]

might be incorrect or incomplete").  Thus, although Defendants can sometimes rely upon

information furnished to them by clients, their reliance cannot be unreasonable.

Finally, § 6694(b) penalizes preparers for understatements of a client's tax

liability due to willful or reckless conduct, 26 U.S.C. 6694(b), including a "willful

disregard of [internal revenue] rules and regulations."  *Judisch v. United States*, 755 F.2d

823, 827 (11th Cir. 1985).  And "willfulness does not require fraudulent intent or an evil

motive; it merely requires a conscious act or omission made in the knowledge that a duty

is therefore not being met."  *Pickering v. United States*,  691 F.2d 853, 855 (8th Cir.

1982) (citation omitted) (holding that, by taking business deductions for personal

expenses on behalf of a client, defendant willfully understated the client's tax liability

because he was on notice that the client's books and records may have been incomplete or

incorrect).

To issue any injunction under § 7407, the Court must also find that injunctive

relief is "appropriate to prevent the recurrence of such conduct."  26 U.S.C. § 7407(b)(2)

(1989).  In making this determination, the Court considers the totality of circumstances,

including the following factors set forth by the Seventh Circuit:

> (1) the gravity of harm caused by the offense; (2) the extent of
> the defendant's participation and his degree of scienter; (3) the

27

> isolated or recurrent nature of the infraction and the likelihood
> that the defendant's customary business activities might again
> involve him in such transactions; (4) the defendant's
> recognition of his own culpability; and (5) the sincerity of his
> assurances against future violations.

*United States v. Benson*, 561 F.3d 718, 724 (7th Cir. 2009) (*quoting United States v. Raymond*, 228 F.3d 804, 813 (7th Cir. 2000)).  Under certain circumstances, § 7407 also gives the Court authority to issue a permanent injunction barring Defendants from acting as tax preparers:

> If the court finds that an income tax return preparer has
> continually or repeatedly engaged in any conduct [prohibited
> herein] and that an injunction prohibiting such conduct would
> not be sufficient to prevent such person's interference with
> the proper administration of this title, the court may enjoin
> such person from acting as an income tax return preparer.

26 U.S.C. § 7407(b).

### ii. Sections 7408 and 7402

Section 7408 authorizes the Court to enjoin a person from further engaging in conduct subject to penalty under §§ 6700, 6701, 6707, or 6708 if the injunction is appropriate to prevent the recurrence of that conduct.  26 U.S.C. § 7408.  Relevant here, § 6701(a) imposes a penalty on any person who (1) aids, assists, or advises in the preparation of a return; (2) has reason to believe the return will be used in connection with any material matter arising under the internal revenue laws; and (3) knows that the return would result in an understatement of the tax liability of another person.  26 U.S.C. § 6701(a) (1989).

Section 7402 authorizes district courts to issue orders, including injunctions, necessary or appropriate for enforcement of the internal revenue laws.  26 U.S.C. § 7402.

### C. Business Deductions

#### i. Generally

Section 61(a)(1) provides that, except as otherwise provided in Subtitle A of the code, gross income means all income from whatever source derived . . . ." 26 U.S.C. 61(a)(1). Section 162(a) provides for deductions from gross income for certain business expenses. 26 U.S.C. § 162(a). To qualify for a deduction under § 162(a), "an item must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense." *Wells Fargo & Co. and Subsidiaries v. C.I.R.*, 224 F.3d 874, 880 (8th Cir. 2000) (quoting *C.I.R. v. Lincoln Savings and Loan Assoc.*, 403 U.S. 345 (1971)) (internal quotations omitted).

"[T]he determination of whether an expense is ordinary and necessary and the taxpayer's purpose in making a particular payment are usually questions of fact." *Wells-Lee v. C.I.R.*, 360 F.2d 665, 669 (8th Cir. 1966). The term "necessary" imposes "only the minimal requirement that the expense be appropriate and helpful for the development of the [taxpayer's] business." *C.I.R. v. Tellier*, 383 U.S. 687, 689 (1966) (quoting *Welch v. Helvering*, 290 U.S. 111, 113 (1933)) (internal quotation omitted). To be "ordinary," the expense must relate to a transaction "of common or frequent occurrence in the type of the business involved." *Deputy v. du Pont*, 308 U.S 488, 495 (1940). Thus, "[i]n general a business expense is tested by its normalcy and soundness considered in light of the nature of the taxpayers trade or business." *Wells-Lee*, 360 F.2d at 669.

Importantly, § 262(a) expressly prohibits deductions for "personal, living, or family expenses." 26 U.S.C. § 262(a). And when both §§ 162(a) and 262(a) apply to an expense, the latter trumps, and the expense is not deductible. *Christey v. United States*, 841 F.2d 809, 814 n.2 (8th Cir. 1988); Henderson *v. C.I.R.*, T.C.M. 1983-372.

Below, the Court considers categories of deductions commonly taken by Defendants on behalf of clients.

29

### ii. Clothing, Grooming, and Other Image Expenses

"Although a business wardrobe is a necessary condition of employment, the cost of the wardrobe has generally been considered a nondeductible personal expense pursuant to section 262." *Hamper v. C.I.R.*, T.C. Summ. Op. 2011-17, *3 (citing *Kennedy v. C.I.R.*, T.C. Memo, 1970-58, *aff'd*, 451 F.2d 1023 (3d Cir. 1971)).  The well-established rule is that expenses for business clothes are only deductible under § 162(a) if the clothing is "(1) required or essential in the taxpayer's employment, (2) not suitable for general or personal wear, and (3) not so worn." *Deihl v. C.I.R.*, T.C. Memo. 2005-287, *25 (citing *Hynes v. C.I.R.*, 74 T.C. 1266, 1290 (1980)).  Courts view this as an objective test that "depends upon what is generally accepted for ordinary street wear." *Pevsnwer v. C.I.R.*, 628 F.2d 467, 470 (5th Cir. 1980); *see also Tilman v. United States*, 644 F.Supp.2d 391, 404-05 (S.D.N.Y. 2009) ("Beautiful gowns and cocktail dresses are a staple in many women's closets, as are earrings, necklaces, bracelets, brooches, rings and watches. . . . As long as other people would wear such clothing in a variety of settings, the clothes are not deductible.").  In *Hamper*, the Tax Court held that a television news anchor improperly deducted expenses for work-related clothing, personal grooming, and a gym membership because they were "inherently personal expenses." *Id.* at *4.  Even an employment contract requiring petitioner to maintain a neat appearance does not "elevate his expenses for personal grooming to a business expense." *Hynes v. C.I.R.*, 74 T.C. 1266, 1292 (1980); *see also Richard Walter Drake v. C.I.R.*, 52 T.C. 842, 844 (1969) (disallowing enlisted man's deduction for haircuts required by the Army).

This rule for deductibility of clothing expenses applies both to employees and self-employed taxpayers. *See Deihl*, T.C. Memo. 2005-287, *25.  In *Deihl*, petitioners formed a corporation to market a spray-on multivitamin that they developed and manufactured. Petitioners' corporation used a multilevel marketing structure similar to that of many home-based business at issue in this case, and petitioners claimed that expenses for their attire and personal grooming were deductible as ordinary and necessary business

expenses because they created the appearance of affluence and success, which attracted downline distributors and created profit. *Id.* at 2. Finding that the Deihl's clothes were suitable for personal wear, the Tax Court disallowed the deductions. *Id.* at *25.

The Court finds that all of the image expense deductions that Defendants took on behalf of clients are improper. Expenses for nail and hair care, dresses, business suits, and fashion accessories are not ordinary and necessary business expenses, and Defendants have presented no evidence that any of the clothing purchased and deducted as image expenses was unsuitable for ordinary street wear. These are "inherently personal expenses," *Hamper*, T.C. Summ. Op. 2011-17, *4, and Defendants should not have taken such deductions for their clients.

### iii. Rent and Home Improvement/Maintenance

"A close relationship between a lessor and lessee [requires] a careful examination of the circumstances surrounding the arrangement to determine whether the payments are, in fact, for the rental of the property." *Tyson v. C.I.R.*, T.C. Memo 2009-176, *5 (citation and quotations omitted). In *Tyson*, the Tax Court concluded that RS Tyson's payments of rent to Rob and Shirley Tyson were not made pursuant to a "bona fide rental" because the rental amounts were mere guesstimates, the rental was not at arm's length, and the agreement had "little reality beyond tax planning."[11] *Id.* This Court agrees. In fact, the *Tyson* court's reasoning applies to all of the rent deductions discussed in Part I-E of this Order, and the Court therefore finds them prohibited by §§ 162(a) and 262(a). Many of the deductions, however, are improper for additional reasons.

First, Defendants took many of the rent deductions – namely those taken for Shrishti, RS Tyson, DJF, Coogan & Associates, and PDC – knowing those clients had no lease and made no actual rent payments. Thus, Defendants deducted expenses that were never actually "incurred" by their clients, as required by § 162(a). *See* 26 U.S.C. §

---

[11]  The Tax Court refers to deductions taken in 2003, when the Tysons were clients of Defendants.

162(a); *Wells Fargo & Co. and Subsidiaries*, 224 F.3d at 880.  Second, many of the rent

deductions were obviously unreasonable.  Shrishti used only four percent of Arindam

Chatterjee's house for office space yet deducted $12,000 in annual rent  – more than half

of Chatterjee's annual mortgage payment for the entire house.  Additionally, Defendants

admitted that DFJ's rental amount was not determined by the amount of space used or the

value of Doris Johnson's house but rather by the amount of money that Johnson removed

from the corporation for various other personal purposes.  Similarly, Defendants

"reclassified" payments that RS Tyson made to Shirley Tyson's creditors as rent

payments.  Like *Tyson*, these rental amounts are mere guesstimates.  *See id.*

Defendants' deductions for clients' home improvement and maintenance costs

were also unreasonable.  Although landscaping and improvement expenses may

sometimes be ordinary and necessary to a home-based business, Defendants deducted

expenses that primarily benefitted the homeowners rather than the businesses.  These

include the costs of termite control, chemicals to treat a one-acre fish pond, a lawn

mower, a well pump, a television, and other personal-use furniture.  *See Dobbe v. C.I.R.*,

T.C. Memo 2000-330, *8 (disallowing landscaping deductions because the landscaping

primarily benefitted the corporation's shareholders and only tangentially benefitted the

corporation).  Even if such expenses somehow incidentally benefitted Defendant's

business clients, they primarily benefitted the homeowners and are therefore prohibited by

§ 262(a).

### iv. Travel Expenses

If a "trip is undertaken for other than business purposes, the travel fares and

expenses incident to travel are personal expenses and the meals and lodging are living

expenses" that are nondeductible.  26 C.F.R. § 1.162-2(a)(2010).   If the trip is primarily

personal in nature, it is not deductible even if the taxpayer conducts some business during

the trip.  *Townsend Industries, Inc. v. United States*, 342 F.3d 890, 892 (8th Cir. 2003)

(citing 26 C.F.R. § 1.162-2 (2010)).  However, expenses "which are allocable to the

taxpayer's trade or business" may still be deducted during otherwise non-deductible travel. *Id.*

Every travel-related deduction discussed in Part I-F was primarily personal in nature. Kim Johnson was not required log diving hours to maintain certification, nor was her diving certification an ordinary and necessary expense of being a swimming instructor. Further, she deducted the cost of dives by family members. Even more egregious is Defendants' deduction for the Tyson family's California vacation. Shirley Tyson explained to Schwartz-Musin that her "whole family" was taking an eleven-day vacation to California for her cousin's wedding and that they were "seeing all the sites." Tyson also explained that she planned to meet her personal coach before checking into the hotel on their first day. Even assuming that Tyson met with her personal coach and that her cousin was "one of [her] best customers," such limited business activities do not come remotely close to justifying an eleven-day vacation for Tyson's entire family. The Coogan's trip to Croatia and London was also personal. In fact, the Coogans never even reported their expenses to Defendants as business-related but instead asked whether it was deductible as a "lifestyle promotion[]." All of these trips were non-deductible personal expenses under § 262.

### v. Child and Pet Care Expenses

A corporation cannot deduct child care expenses where the primary benefit of those expenses is incurred by the employee-owner, and not the business. *Settimo v. C.I.R.*, 92 T.C.M. (CCH) 473 (2006) (disallowing child care expenses by an an S-Corporation); *see also Davis v. C.I.R.*, 92 T.C.M. (CCH) 514 (2006) ("We have consistently held that two-earner married couples may not deduct, as a business expense under section 162, the cost of care for their children during working hours.") (citing *O'Reilly v. C.I.R.*, T.C. Memo. 1974-261 (collecting cases)). Similarly, a corporation cannot deduct expenses for its incorporators' dog care expenses. *See Chaney v. C.I.R.*, 97 T.C.M. (CCH) 1293 (2009) (finding that taxpayers acted in bad faith by, among other

things, taking deductions for expenses related to care of their dog while away on business).[12]

Accordingly, the Court finds that the childcare deductions for Shrishti, Applied Video Compression, and Internet Solver are all improper, and the Defendants knew it. These expenses are not ordinary to running a business, and they are clearly "family" expenses under § 262(a).

### vi. Firefighter and Paramedic Meal Expenses

Ordinarily, the cost of one's meals is a non-deductible personal expense.  Treas. Reg. § 1.262-1(b)(5).  If employees are not traveling, their meal expenses are deductible only if the employee must purchase a meal or must pay into a meal fund as a necessary condition of employment.  *Compare Phillips v. C.I.R.*, 52 T.C.M. (CCH) 747 (1986) *and Duggan v. C.I.R.*, 77 T.C. 911 (1981) (both disallowing deductions under § 162(a) for firefighter meal expenses), *with Sibla v. C.I.R.*, 68 T.C. 422 (1977) (allowing a deduction for firefighter meal expenses where firefighters were required to contribute to a "mess fund").  *See also Christey*, 841 F.2d at 810 (allowing deduction on the basis that highway patrol officers were required to eat their meals in a roadside restaurant and were not allowed to bring meals from home).  Thus, if employees are allowed to bring meals from home or their contribution to a "mess fund" is voluntary, their meal expenses are non-deductible personal expenses under § 262.

Defendants deducted firefighter and paramedic meal expenses despite the fact that their clients were not required to contribute to a mess fund, and they relied upon a one-page document that Schwartz-Musin allegedly obtained at a tax conference without any additional research or inquiry.  The Court finds that Defendants' reliance on this document – in the face of much tax literature and case law to the contrary – was unreasonable – and certainly negligent –  and that these deductions were not allowed

---

[12] The Chaneys were Defendants' clients when the "bad faith" deductions were taken.

under §§ 162(a) and 262.

### vii. Tuition

The tuition deductions taken by Defendants are clearly prohibited by §§ 162(a) and 262.  There is nothing ordinary about a technology consulting company, Gerdes Group, spending over $12,000 in nursing-school tuition for its owner's wife.  Similarly, the expenditure of over $14,000 for the Chatterjee-Lahiri daughters' tuition provided no benefit to Shrishti, a management consulting company.  Theses expense do not relate to any transaction "of common or frequent occurrence in the type of the business involved." *Deputy*, 308 U.S at 495 (1940).  Moreover, tuition for one's child is unquestionably a "personal, living, or family expense[]" disallowed by § 262.  26 U.S.C. § 262. Defendants knew these deductions were for family members' tuition, and the took the deductions anyway.

### viii. Business Gifts

 "The cost of gifts may be an ordinary necessary business expenses if the gifts are connected with the taxpayer's opportunity to generate business income." *Bruns v. C.I.R.*, T.C. Memo. 2009-168, *8 (citation omitted).  Business gift deductions are limited, however, to $25 per donee per taxable year. 26 U.S.C. § 274(b)(1).  Section 274(d) also requires the taxpayer to substantiate with records or other adequate evidence (1) the amount of the expenses; (2) the date and description of the gift; (3) the business purpose of the gift; and (4) the business relationship to the taxpayer of the person receiving the gift.  26 U.S.C. § 274(d).

Here, the Court finds that the gifts at issue were often – if not always – ordinary and necessary business expenses.  Many of Defendants' clients rely upon customer referrals and downstream-distributor goodwill to generate additional business.  However, Defendants deducted gifts in amounts well-over the $25 limit, which is prohibited by § 274(b)(1). *See Bruns*, Memo 2009-168, *8 (affirming Commissioner's disallowance of any amount over $25.00 deducted for gifts to customers and referral sources).

35

### ix. Meal and Entertainment Expenses

Section 274(n) provides a limitation on the deductibility of any meal and entertainment expenses under § 162(a).  Specifically, "[t]he amount allowable as a deduction under this chapter for . . . any expense for food or beverages . . . shall not exceed 50 percent of the amount of such expense."  26 U.S.C. § 274(n).  Contrary to Defendants' stated belief, no exception exists for food or beverages provided at meetings where the "primary focus" is solely on business.  Accordingly, Defendants improperly deducted one-hundred percent of meal and grocery expenses for Nolan Enterprises in 2004 and Alagappa International in 2008.

### x. Employee Benefits Plans

Section 105(a) provides that – except as otherwise provided in that section – amounts actually received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer.  26 U.S.C. § 105(a).  Section 105(b) creates an exception from subsection (a), however, for amounts paid to the taxpayer to reimburse the taxpayer for expenses incurred for medical care of the taxpayer or the taxpayer's spouse or dependents.  26 U.S.C. § 105(b).  However, payments to employees for medical expenses incurred before the date of adoption for an employee benefits plan are not excludable from employees' gross income.  *Seidel v. C.I.R.*, T.C. Memo 1971-238 (citing 26 C.F.R. § 1.105-5); *see also* Revenue Ruling 2002-58.  Here, Defendants encouraged multiple clients to backdate their employee benefits plan so that they could deduct any prior payments made by the companies.  Thus, Defendants again proved themselves willing to deceive the IRS by backdating substantive documentation.

### xi. Club Membership Dues

Fees or dues for membership in a "club organized for business, pleasure, recreation or other social purpose" are non-deductible expenses.  26 U.S.C. § 274(a)(3).  This

includes, "country clubs, golf and athletic clubs, . . . and clubs operated to provide meals under circumstances generally considered to be conducive to business discussion." 26 C.F.R. § 1.274-2(a)(iii); *see also Deihl*, 90 T.C.M. (CCH) 579, *18 (2005) (denying deduction claimed for country club dues). Thus, the business deductions for Bryan Michael's country club membership, George Hasselmann's golf league, and Ram Vairavan's fitness club membership were prohibited by § 274(a)(3).

### xii. Legal Expenses

Legal fees are deductible as business expenses only if the business or corporation primarily benefitted from the legal services obtained. *Hood v. C.I.R.*, 115 T.C. 172, 181 (2000) (disallowing corporate deduction for legal fees related to defending sole shareholder against criminal tax evasion charges). Although the preparation of a person's will may involve corporate ownership and succession issues, it is primarily a personal legal service. Defendants should not have deducted such legal fees on Becker Chaney & Associates 2003 tax return. Similarly, there is nothing ordinary or necessary about expenses related to criminal legal services for Bob and Jenny Williams' son, who was charged with driving under the influence of alcohol. The business did not benefit from these expenses, and Defendants should not have deducted them.

### D. Appropriateness of a Permanent Injunction

The Court finds that a permanent injunction – forever prohibiting the Defendants from acting as tax preparers – is both necessary and appropriate under the standard set forth in § 7407. Initially, it is worth noting that the Court's findings of fact are sufficient to impose an injunction under §§ 7407, 7408, and 7402. However, because § 7407 explicitly provides authority to permanently enjoin Defendants from acting as tax preparers and because the prohibitions of § 7407 best apply to the various instances and kinds of Defendants' misconduct, the Court will focus its analysis on that section. To that end, the Court notes that it is undisputed that Defendants are tax prepares as defined by § 7701(a)(36). Thus, the Court need only determine (1) whether Defendants engaged in

misconduct under §§ 7704 and 6694; and (2) whether a permanent injunction is the appropriate remedy.

### i. Sections 7407 and 6694 Conduct

Examples of Defendants' misconduct under § 6694 are legion.  The evidence at trial revealed Defendants' clear disregard for the Internal Revenue Code, the IRS, federal courts, and basic fairness.  As discussed earlier, Defendants took numerous unrealistic positions as to business deductions for rent, home improvements, vacations, groceries, contract labor, image expenses, legal fees, and many other quintessentially personal expenses.  These deductions fail the "ordinary and necessary" test under § 162(a), as well as the more specific tests discussed above.  And even if certain personal expenses were somewhat related to a client's business, deduction was expressly disallowed by § 262(a), which prohibits business deductions for "personal, living, or family expenses."  26 U.S.C. § 262(a).  Moreover, Defendants often took deductions for expenses or losses never actually incurred, such as the numerous rent deductions taken when no rent was ever paid or the bad debt deduction when the Aldrich's debt was almost entirely repaid.

The tax positions discussed in Section I had "no realistic possibility of being sustained on the merits."  26 U.S.C. 6694(a) (1989).  The Defendants knew this and were also more than merely negligent.  Defendants' blind reliance upon information furnished by their clients was unreasonable, particularly in light of the advice they routinely provided clients and the facial impropriety of many of the deductions.   However, the evidence  – including numerous instances of "relabeling" and "reclassification" to disguise deductions – leads the Court to conclude that Defendants's conduct was not only negligent but reckless and willful.  *See* 26 U.S.C. § 6694(b).  Defendants are not, as they claim to be, innocent preparers beset by dozens of dishonest clients who all just happened upon the same tax practice.  Rather, Defendants advertised their willingness to deduct any and all expenses in order to attract clients, they miseducated clients as to the deductibility of personal expenses by promoting a "write-of-your-lifestyle" approach to tax

preparation, and they assisted clients in carrying out that approach by taking overstated deductions and sometimes fabricating substantiative documents during the audit process. Defendants have engaged in a great deal of misconduct under § 6694.

Additionally, though, Defendants misrepresented their qualifications to both clients and the IRS on multiple occasions – conduct that alone justifies an injunction under § 7407.

### ii. A Permanent Injunction is Necessary

The Court must now determine the appropriate remedy for Defendants' misconduct. To permanently enjoin Defendants from acting as tax return preparers, the Court must find that (1) an injunction is appropriate to prevent the recurrence of conduct proscribed by § 7407; (2) Defendants have "continually and repeatedly" engaged in such conduct; and (2) a narrower injunction prohibiting just that proscribed conduct would be insufficient.  26 U.S.C. § 7407.  Applying this standard, the Court concludes that a permanent injunction is justified in this case.

An injunction is appropriate and necessary to prevent the recurrence of Defendants' misconduct.  The Court notes that other sanctions, including a criminal conviction, have proven ineffective and that Defendants not only take improper deductions but also try to hide those deductions under misleading or ambiguous labels, such as deducting images expenses as "supplies" or "advertising."   The other  factors set forth in *Benson* support this conclusion.  *See Benson*, 561 F.3d at 724. The gravity of the harm caused by Defendants' misconduct is great.  *See id.*  It has resulted in numerous investigations, audits, and settlement procedures by the IRS; an unknowable number of unaudited but inaccurate returns filed by other clients; and this protracted lawsuit.

Defendants' participation and degree of scienter also weigh in favor of an injunction.  *See id.*  Schwartz-Musin and Musin each prepared a large number of returns, and Howard Musin signed every return their company prepared.  Defendants' attempts to explain away their over-deductions and various other deceptions were belied by the clear

39

pattern of deceit revealed at trial, evidenced by the sheer volume of bad returns they filed. For every client who provided an expense report with unrealistic deductions, Defendants claim to have relied entirely on the documentation and to unfailingly trust the client.  Yet, for every client whose return reflected greater deductions than they had recorded on expense reports, Defendants claim to have had an undocumented conversation with the client, which invariably resulted in the discovery of additional deductible expenses.  The Court finds this literally incredible.

Defendants' misconduct also has been continual and repeated.  Starting in 1987, the IRS and the federal courts have applied a series of graduated sanctions to Defendants, particularly to Jill Schwartz-Musin.  But Defendants are again before the Court, having engaged in exactly the same conduct previously sanctioned, as well as additional misconduct for which they have never before been penalized.  Neither an IRS bar nor a criminal conviction – notice of wrongdoing in the most egregious manner – has dissuaded Defendants from taking bad deductions and otherwise cheating the IRS.  Moreover, Defendants' testimony also made clear that they refuse to accept any culpability.  They testified that they consider image expenses to be fully and properly deductible notwithstanding established law to the contrary, and that they stopped deducting image expenses only because it was no longer worth the trouble.

Finally, a narrower injunction –  prohibiting only the various kinds of misconduct Defendants commit – would be insufficient, if not altogether futile.  If disqualification from practice before the IRS and criminal penalties were insufficient, an item-by-item injunction would likely also be sidestepped, and it would be extremely difficult to monitor and enforce.   For these reasons, the Court finds it necessary to permanently enjoin Defendants from acting as tax preparers, a penalty that is unquestionably warranted by Defendants' misconduct.

### III. CONCLUSION

Upon the foregoing,

**IT IS ORDERED** that Defendants Howard Musin, Jill Schwartz-Musin, SSC Services, Inc., M-S Services, Inc., and Schwartz's Systems Corporation are permanently enjoined from acting as tax preparers under 26 U.S.C. § 7407. The clerk shall enter judgment accordingly.

**DATED** this 12th day of July, 2011.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA